The court will stand in recess for 10 minutes. Nigl v. Litscher. Ms. Nicholas. Good morning. May it please the court. The Wisconsin Department of Corrections has prohibited Mr. Nigl from marrying his fiancee, Dr. Sandra Johnston, for three years. As the Supreme Court recognized 30 years ago in Turner v. Safley, marriage is an expression of emotional support and public commitment. Within Mr. Nigl and Dr. Johnston's shared religion, marriage has a sacred, spiritual dimension. And as the Supreme Court recognized in Turner, these emotional and spiritual dimensions of marriage are unaffected by the fact of incarceration. The decision below upheld the Department of Corrections' decision to prohibit Mr. Nigl and Dr. Johnston from getting married on the basis that the Department determined that allowing quote-unquote rule breakers to marry one another would compromise prison security by undermining respect for the prison's rules. The decision was in error and should be reversed for three principal reasons. First, there's a profound lack of evidence that the Department of Corrections could not accommodate a brief, well-supervised marriage ceremony without compromising prison security. Second, it's hard to hypothesize circumstances where that's not true. Right. In other words, if the question is limited, you know, as you just described it, can we have a marriage ceremony go off without, you know, violent outbreaks or, you know, complete mayhem at the facility? Anybody's going to be able to marry. I think that under Turner and this Court's decision in Raker, the real question is one of balance. It's can this brief, well-supervised marriage ceremony be allowed to take place half an hour, you know, under an hour, certainly, without unduly burdening prison resources? And I think— Look, I think we should talk about Raker, which held, of course, the Department of Sales to show that its decision prohibiting the marriage had a logical connection to its security concerns. But it seems to me that that connection is apparent here. Unlike Raker, which relied on the visitation policy and the concerns surrounding that to deny the marriage request, here, doesn't the relationship itself present safety and security concerns? Because it arose from the unethical exploitation of the psychologist-patient relationship. We're not talking about some kitchen worker here. There's a couple of responses to that. The first is that the logic that the Department of Corrections and the decision below both used to uphold the denial of the request to marry is the same as what was used in Raker, meaning that it's looking at it at this very high level of generality, that the relationship was perceived to have violated rules against fraternization, and that, in turn, was deemed to be something the department could not countenance. But what the Raker decision counseled was that that was really too high a level of generality at which to look at this question, and the question was really whether a marriage could go forward. With regard to the court's point about whether the relationship itself might be said to be undermining the security of the prison, I think that's an important question for us to talk about here, because the truth is the relationship continues unabated and has for the past four years. Mr. Neagle and Dr. Johnston talk via phone or email every single day to this day. So really the question is whether this half-hour marriage ceremony can be allowed to go forward, because all of these concerns that the department is pointing to and that the decision below pointed to really do go to that question of whether it would be reasonable or rational to prohibit general, unlimited visitation privileges. That's not what Mr. Neagle and Dr. Johnston are asking for here. They're just asking for an opportunity to have their marriage sanctified. See, I guess I just don't read Warden Meisner's declaration as resting on hopelessly general rationale to prohibit the marriage. I read the declaration to go through in some detail the various acts of deception that Ms. Johnston engaged in, and it's not just one, right? There's multiple. And then from there reaching a conclusion that it would compromise the security, and I think read in context the integrity of the facility, to allow her at this time to return, albeit for a brief marriage ceremony. And I just see that as really very, very different than the circumstances that were present in Riker, I think as Judge Robner suggested in her question. Riker does not involve the cafeteria supervisor engaging in multiple acts of deception, including violations of professional standards. A few things that I think need to be said in response to that. Unfortunately, the decision below accepted as true a lot of what the department concluded about the relationship or what the department represented about the relationship. In reality, the department's own investigation of Dr. Johnston and Mr. Neagle concluded that there was no evidence a relationship had begun while Dr. Johnston was employed with the Department of Corrections. The discipline that Dr. Johnston received was simply based on the fact that her relationship with Mr. Neagle commenced within less than two years of her having what the professional regulating body saw as a professional relationship with him. So the plaintiffs dispute that there were these rule violations or a pattern of deception that was carried out to further this relationship. And more broadly, I think we have to look at what was happening in the Riker case in terms of the violations that were happening. There was a documented sexual relationship that violated the Prison Rape Elimination Act happening in the freezers in the cafeteria area of the prison between the supervisory employee and the inmate in that case. And while that's, of course, serious and worthy of punishment and perhaps a denial of visitation privileges, at least for some period of time, this court still held that you really had to view the question at a more specific level, which is whether this brief marriage ceremony could be accomplished without compromising prison security or unduly burdening prison resources. And that's what this court found in Riker, was that in the absence of evidence that that ceremony could be accommodated, it really wasn't appropriate to deny people the right, the basic human dignity to have their marriage religiously and publicly recognized as a statement of their support for one another, their love for one another, and the religious and spiritual aspects of actually becoming married. So that suggests that the nature of a past rule violation is irrelevant. Well, I think at some point it has to become irrelevant. There's really no decision that countenances the idea on which the lower court's decision rests, which is that a past rule violation is a justification for a permanent deprivation of a constitutionally protected interest on the theory that that punishment, that deprivation, will promote respect for the rules, not just by the people whom you're depriving of their constitutional rights, but perhaps by other people who might see that this marriage has occurred. Did the district court use the word permanent deprivation? The district court did not, but that's really what's at stake here. The Department of Correction's own marriage policy does not allow for reapplication. There is nothing in the department's decisions that say this is temporary reapplying a year if you still want to get married. In fact, this litigation has been going on for more than two years, and the department could have at any time settled this case by coming to Mr. Neagle and Dr. Johnston and saying, okay, now that three years have gone by, we'll take another look at this. But they haven't done so. I would have thought one of the first things Mr. Neagle did when he got to the new facility was apply for permission to marry. Well, he has already appealed the decision to the highest level, and it was rejected by the designee of the secretary of the Department of Corrections on two occasions, as reflected in our brief and admitted by the defendants in their answer to the complaint. So there's really no indication that the fact that he's moved to a new facility will lead to any change in the department's viewpoint towards this. How do you think – I'm sorry, there's a bit of a lag. I'm sorry. We should factor in the fact that a psychologist-patient relationship is considered unethical and grounds for loss of license, even criminal prosecution in some jurisdictions, for civilians, let alone in prison, where rights are curtailed. Dr. Johnston and Mr. Neagle both strongly deny that any relationship began while Dr. Johnston was working for the Department of Corrections. In fact, the record shows that it was only after she no longer worked at the Department of Corrections that Mr. Neagle asked his brother if he could try to find her contact information, and then they began corresponding via letter. But they met at that time. I mean, that's how they met. That's how they interacted. They did meet while Dr. Johnston was working at the Department of Corrections. Dr. Johnston and Mr. Neagle further both deny that there was a psychologist-patient relationship here. While she met him while she was working for the Department of Corrections, she was not providing him therapy, he was not diagnosed as having any mental illness, and he was not a psychology patient of hers. How did they meet? When Dr. Johnston began working at the Department of Corrections, she had a list of inmates with whom she was supposed to meet, and Mr. Neagle was on that list. She met with him. He said, I don't need therapy and I don't want therapy, and she concurred that it was not something that she had to do. So after that, their contacts were more casual within the Department of Corrections. While she was still employed there, their interactions were not in the context of a therapist-patient relationship. Well, then how did they have contact? I'm really missing something. I mean, they were seeing each other. How? If they weren't in some sort of a professional relationship. Well, there were only a few times that they actually met in person while she was working at the Department of Corrections, and Mr. Neagle went to see her to talk to her on several occasions. So it is a disputed fact that there was ever a psychologist-patient relationship here, and I think that's something that would be more appropriately submitted to a jury determination rather than having the district court make that conclusion as a matter of law. She herself characterized the relationship as professional. That's true, and she was an employee of the Department of Corrections at the time they met, no doubt about that, and when she submitted the policy exception request, she did indicate that she'd met Mr. Neagle in a professional context, and that's unavoidably true here. But the question is really whether that can justify this long-lasting denial of such a fundamental right as the right to marry, now going on four years later that they have been. Do you want to reserve some time for rebuttal? Yes, thank you, Your Honor. Thank you. Mr. Kilpatrick. Good morning. May it please the Court. My name is Stephen Kilpatrick, Wisconsin Assistant Attorney General for the Wisconsin Department of Corrections employees, the defendants, the appellees. The Supreme Court has held that courts must accord substantial deference to the professional judgment of prison administrators who bear a significant responsibility for defining the legitimate goals of a correction system and defining the most appropriate means to accomplish them, and the challengers to a decision or rule bear the burden of proving that to be unreasonable. The appellants have not met that burden in proving denial of their marriage request unreasonable, and the district court got it right. Here, Warden Meisner used his professional judgment to deny a marriage request of inmate Paul Nigel and his former department clinical psychologist, Dr. Sandra Johnston. The peniological interests behind that denial were security of the institution and rehabilitation of the inmate. There's a rational connection, the first turner factor, between the denial and those interests. Warden Meisner needs to ensure the safety of the prison, respect for the rules, and rehabilitation of inmates. He could not give his... Is there, forgive me, but is there any dispute that the relationship began while Dr. Johnston was providing psychological services to Mr. Nigel as an employee while Penninger really had disputed that? There is no fact that there was a personal relationship going on. It's implied because of the phone calls that were recorded and what was said within a few weeks after she had left. But that really doesn't matter because when Dr. Johnston left, she took another job and came back in the fall of 2015. She established or continued this relationship with the inmate. What I'm trying to get to is this. Did the relationship begin when Dr. Johnston was providing psychological services? Well, there was certainly a professional relationship that began, and that is clear from the psychology examining board's decision. And whether or not there was a doctor-patient relationship or whether he was receiving services from a doctor while in prison is really irrelevant. It's semantics. What was going on was there was counseling going on between the two. That is how they met, and within weeks after that, she had left that employment. They began this correspondence. And then when she returned to the Department of Corrections in the fall of 2015, she wanted to continue this relationship. She knew she had to submit a fraternization request exception. She submitted it, knew that it wasn't being forwarded on to the authorities higher up in the system, yet continued to have the relationship with the inmate. Given the potential that such a relationship between a psychologist and a patient, any patient, not just a prisoner patient, is exploitative, is there any passage of time that would matter here? In other words, is there a point at which the danger to the former patient's mental health would no longer be significant enough to justify denial of the marriage request, like in 10 years? Right. Well, that leads me, I am going to answer your question, leads me to the first point I would like to make, is that this is not a permanent ban. The other side wants to categorize this as a permanent ban. There is nothing in the record that would show this is a permanent ban. Opposing counsel said that DOC policy does, well, I want to make it clear, DOC policy does not ban reapplication. There is nothing in the policy that bans reapplication of a marriage request. And getting to your point, Judge Rovner, is I believe what happened here is we'll never know the answer to that question because they have never submitted a new marriage application request. What they did was submitted one in December of 2016. The denial took place in January. That was about 15 months or so after Dr. Johnston had last been a DOC employee. Within a few months of when the warden had gotten word and read the psychology examining board's final decision that she had been exploitative to the inmate. And possibly an answer to that question, Judge Rovner, is maybe two years. This was still within two years. The psychology examining board has a rule that says, one, you can't be in a relationship as a psychologist with a client. And two, you can't be in a relationship with a former client until two years have passed. So when the marriage request came in, the warden, using his professional judgment, adopted the rules of the psychology examining board and said, look, this professional rule says there shouldn't be a relationship within two years of the end of the patient-doctor relationship. It's almost like a two-year cooling-off period. That's what the rule says. So he made that decision. The decision to deny marriage request was made within that two-year period. So it's our position that at least 15 months is fine to take into consideration the rule-breaking, not only the rule-breaking of the institution, the work rules, but the psychology examining board's rules. I read your brief, Mr. Kilpatrick, to go a touch further, and that is to say, as you do on page 27, that the plaintiffs are free to submit a new marriage request, and presumably the state would not take that position and make that representation to the court if it was entirely futile. In other words, if as a matter of policy or as just a matter of practice, the marriage ban was permanent. I don't think you'd make that representation. I'm sorry. Are you saying that the brief seems to imply that the marriage ban was permanent? No, to the contrary. I think you're saying they're free to submit a new request. They didn't want to wait for a window of time to pass. But I'm reading your brief to suggest that because there's a possibility, well, it would be considered in good faith, and who knows what the outcome will be. They can't promise anything, but they can submit a new request. That's right. They can't promise anything, but they can submit a new request. As time passes, that would be a factor in the new warden here because the inmate has been transferred. A new warden could take into account the rule violations, the institution violations, and the psychological board examining findings and determine, okay, enough time has passed. That is no longer going to be a factor. But we don't know that, and we won't know that because up until now, there has never been a new request made for marriage by these two plaintiffs. With good time considered, can you give us any idea of how many more years Mr. Nigel has to serve? I can, Your Honor. There's nothing in the record, but I can represent to you that I did check with Department of Corrections officials, and Mr. Nigel is not eligible for release until 2062, I believe. That is the case. I'd like to make some other points about Riker. This is definitely a case that is different than Riker based on some of the statements that I've made before. In Riker, the prison rule prevented forever visitation by a former employee with an inmate if the relationship began while the inmate was an employee. That's not the case here. Again, that's not the basis. Defendants relied on specific security concerns in Riker based on being a former employee, Ms. Riker. Not the case here. This isn't about whether or not there can be enough security for a brief marriage ceremony. That is a factor that this court considered, or those facts in one of the three or four Turner factors, the third or fourth Turner factor. In this case, this was based solely on the first Turner factor, so there was no need for the department here to get into whether or not there could be a brief marriage ceremony. That's a big difference between this case and Riker. In Riker, this court held that there was no evidence in the record for the rational relationship. Department of Corrections here says there is a mountain of evidence that would support the warden's decision that approval of a marriage request at that time would have been detrimental and contrary to the penological interests, again, of security of the facility, safety, and also rehabilitation of the inmate. Again, Dr. Warden Meisner believed that the inmate was a victim and was exploited by this Department of Corrections employee and clinical psychologist, and that was confirmed, or he believed that to be true, through the psychology examining board. Also in Riker, there was a footnote that said here there was no argument or no factual basis  by the corrections officials in Riker. Here we believe that there is evidence, strong evidence, of the professional judgment used by Warden Meisner, mainly adopting and considering what the psychology examining board found. So it's not so much that her license was taken away. It's more of the finding that she did not believe she had violated any ethical rules and that there was exploitation found by the psychology examining board. Those are very important and distinguishable facts. Again, this is not a case where Warden Meisner denied the marriage because he thought Dr. Johnston had some intimate knowledge of security. That goes, again, to the brief marriage ceremony argument which the department has conceded and didn't even raise. If a marriage were to take place, does it give any increased visitation as opposed to what is available now for Dr. Johnston and this prisoner? No, there would still need to be a visitation request submitted and approved. Again, on appeal, the plaintiffs and appellants had dropped those challenges to the visitation denials. This is only about the marriage request. Again, in Riker, the denial of the marriage request was based on the denial of the visitation. Here, that's not the case. There are other interests, phenological interests going on here, which we explained. Another point I'd like to make is the evidence. The evidence here shows a big difference between rule violations in Riker and rule violations here. The inmate here continued a personal relationship with the doctor in violation of the fraternization prohibition. Same goes with Dr. Johnston. She knowingly communicated under an alias, which the warden properly perceived to be intentional deception. She misrepresented the nature of the relationship she had on multiple visitation forms, simply saying that the relationship was professional and that they were friends, not disclosing the romantic relationship. Both of them obviously continuing the relationship without administrator approval after that fraternization request never was approved. Again, these are all reasonably related. These rule violations are reasonably related to the penological interests and the denial of the marriage request. Was she registered for telephone purposes, for telephone calls under her true name or under an alias? At the beginning, she had used an alias, Cassie Fox or Cassie, and that was what Warden Meisner believed was done purposely to avoid detection by the Department of Corrections staff. I believe later on, after the investigation found out that she had used that alias, I believe that that violation of using an alias was no longer used, that she used her real name. But at the time this began, shortly after her last day in January of 2015, the letters started, the phone calls started, and she had used her name, not her name, she used the name Cassie or Cassie Fox. That's all I have. Any more questions? Thank you. All right, thank you, Mr. Kirkpatrick. Ms. Nicholas. Thank you. Just a few points. First, with regard to Riker v. Lemon, there is one way in which this case is identical to Riker, which is that nothing would change in terms of prison security if these two are allowed to marry. As I mentioned before, they are already talking on the phone or by email every single day, and they don't seek any level of change in that amount of contact. So everything would stay the same in terms of Dr. Johnston's contacts with the institution if they're allowed to marry. Secondly, with this idea that they should just apply again because now he's at a new facility, there are several problems with that. One is that this litigation has been pending for over two years. At any time, the Department of Corrections could have fixed this by saying, we're ready to take another look at this, let's look at this application again. They haven't done that, so it's a bit disingenuous to make this last-second attempt to really evade a decision on the constitutional issue, which is one that's extremely important. Moreover, it would just leave this question unanswered, whether a Department of Corrections, consistent with Turner, can prohibit a marriage as a punishment, essentially, for a past violation of the rules with an aim towards promoting future respect towards the rules. It really doesn't have any limiting principle and would have terrible consequences for people who are incarcerated. Does it not speak to whether or not a professional like Dr. Johnson should be made aware, both she and any other professional in her position, about Department of Corrections policy on contact? You know, we spoke about the initial contact. All her contact was professional with anybody, was it not? When she first arrived at the institution? I think there's an important distinction to be made between professional contact and psychologist-patient relationship, which, again, she disputes and Mr. Neagle disputes ever occurred, and I didn't really hear anything from the department's counsel that disagreed with the characterization here. And I guess I would just say to your question that they've been made very well aware of the consequences of having not respected the department's rules. It has now been four years that they've been engaged to be married and they've been prohibited from seeing one another and their marriage request has still been denied. So there has to be some point at which it ends. Thank you, Your Honor. Thank you. Thanks to all counsel. The case is taken under advisement.